# STATE OF MICHIGAN

# COURT OF APPEALS

JOSEPH DAVENPORT,

      Plaintiff-Appellant,

v

BOJAN HRPKA,

      Defendant-Appellee.

UNPUBLISHED
June 9, 2015

No. 321615
Kalamazoo Circuit Court
LC No. 2012-000433-CK

Before: HOEKSTRA, P.J., and O'CONNELL and MURRAY, JJ.

PER CURIAM.

Plaintiff, Joseph Davenport, appeals as of right the trial court's November 14, 2013 order granting partial summary disposition to defendant, Bojan Hrpka, on all of Davenport's claims except his unjust enrichment claim. Davenport also appeals as of right the trial court's November 14, 2013 decision denying damages on his unjust enrichment claim for household services he provided Hrpka. We affirm.

## I. FACTS

Davenport and Hrpka began living together in 2005, in California. In February 2010, Hrpka obtained a medical residency in Kalamazoo, Michigan, and the parties exchanged a series of emails about moving to Michigan. During the email exchanges, Davenport indicated that his ongoing education in California was important to him and the parties would "need to come up with some type of agreement" if Davenport were to move. In May 2010, Hrpka stated in an email:

> I know you are scared of moving, I promise to give you the palimony for all you are giving up and to make you feel more secure and to come out to my mother within the first 6 months. I love you[.]

Hrpka also admitted at his deposition that he intended to support Davenport and repay Davenport money that Davenport had paid toward Hrpka's student loans. Hrpka testified that he supported Davenport because they lived together. Hrpka testified that he believed Davenport moved to Michigan because he loved Hrpka. Davenport testified that Hrpka misled him and made false statements to induce him to move to Michigan from California, but he also testified that he did not have any evidence that Hrpka's statements were false when he made them.

-1-

Both Hrpka and Davenport testified that Davenport did most of the household chores and took care of the parties' finances while Hrpka attended medical school. According to Davenport, he did so with the expectation that his "life would be better in the future financially." However, Davenport expressed confusion when asked whether he expected wages for his services and testified that he believed that "if I were to continue taking care of him doing what I was doing, being the dutiful house spouse my life would be better and the sacrifices would be worth it in the end." Hrpka testified that Davenport never asked for compensation for his services.

Hrpka testified that the parties' relationship began to deteriorate because Davenport began "demanding half of [Hrpka's] income for the number of years we were together." Davenport testified that Hrpka promised he would receive 50 percent of Hrpka's earnings for the length of their relationship. The parties agreed to get married in New York in November 2011, but Hrpka cancelled the wedding a few days before the ceremony. Hrpka testified that he cancelled the wedding because Davenport was physically violent with him. Davenport testified that he struck Hrpka on five occasions. Hrpka testified that after Davenport struck him, one of Davenport's friends began working on a contract. This contract, dated November 8, 2011, provides the following:[1]

> Joseph Davenport and Bojan Hrpka have been in LOVE since our very first date on Nevember 12th, 2004. We have continued to love each other through good times and bad times.
>
> We were to be married on November 12th, 2011 and Bojan felt that it was not the right time to get married so what we have both decided to do is postpone our wedding for a day when we can both say our vows to each other while our hearts are pumping with love. (A Note from Joseph: I can't wait for that beautiful day)
>
> We have both decided that seeking out counseling will be very beneficial for the both of us. So that is what we will do
>
> Joseph will also start seeing an anger management specialist. I know I have temper problems and I want to change to become a better for Bojan so that he feels protected by me and not afraid of me.
>
> We will also seek out legal advice to form a common-law partner agreement, also wills and power of attorneys. Should the relationship dissolve Bojan Hrpka will commit to giving Joseph L. Davenport spousal support on his future earnings for the length of their relationship. Joseph L. Davenport will be paid in full of his settlement that he received in September 2010 in the amount of $150,000. Bojan Hrpka will get equal ownership of all our household items that Joseph L. Davenport purchased in 2006. And we both need to compromise with each other so that we are both happy. (I know this is fantasy but I really like you they did it in the birdcage how they owned half each other) This agreement is to make

---

[1] All spelling, punctuation, and other errors are found in the original.

Joseph feel safe and he hopes that he will never have to use. I still to this day want to grow old and be on matching rockers with Bojan in 30 years.

I really want us to forget all this evilness and just take our trip to New York and have a great time. We have both not gotten away in quite some time and it will be nice to spend some time alone with you in New York and then with family and friends.

I Joseph L. Davenport commit my life to loving and protecting Bojan Hrpka

I Bojan Hrpka commit my life to loving and protecting Joseph L. Davenport

[Signatures and dates.]

Hrpka testified that the purpose of the contract was for the parties to agree to obtain an attorney to discuss powers of attorney and other legal documents. Davenport testified that he made appointments to discuss matters with an attorney, but Hrpka cancelled the appointments.

According to Hrpka, in June 2012, the parties had an argument that ended with Davenport striking him repeatedly. Hrpka left the parties' apartment and sought medical attention. Hrpka's hospital report indicated that he had suffered injuries to his neck, chest, and back. The parties' relationship ended.

In August 2012, Davenport filed his complaint in this action. Davenport alleged claims of breach of contract, unjust enrichment, negligent and intentional infliction of emotional distress, fraud, joint venture, and partnership. In July 2013, Hrpka moved for summary disposition under MCR 2.116(C)(10), contending that the parties' contract was invalid because it did not have a proper legal purpose, he did not engage in extreme and outrageous conduct, Davenport had not pleaded a claim of fraud, and the parties' relationship was personal rather than a joint venture or partnership. In his response, Davenport also moved for summary disposition under MCR 2.116(C)(10).

In a detailed opinion and order in November 2013, the trial court granted Hrpka's motion for summary disposition on all Davenport's claims except for Davenport's unjust enrichment claim. It then granted Davenport's motion for summary disposition on the unjust enrichment claim. The trial court determined that the parties' contract was void under the Michigan Marriage Amendment, Const 1963, art 1, § 25, because it purported to create a similar union to marriage. The trial court determined that the contract was independently void under common-law principles. The trial court also reasoned that Davenport had not overcome the presumption that services rendered during a meretricious relationship are gratuitous.

Regarding unjust enrichment, the trial court determined that Hrpka admitted that he received money from Davenport that he intended to repay. The trial court determined that to the extent that Davenport paid for Hrpka's student loans, Hrpka was unjustly enriched. However, it also determined that "[t]o the extent Davenport bases his claim for unjust enrichment on his providing household services to Hrpka, he has not addressed this basis or his claim in his brief."

-3-

The trial court granted summary disposition on Davenport's intentional infliction of emotional distress claim because Hrpka's actions were not beyond the bounds of decency, and granted summary disposition on his negligent infliction of emotional distress claim because Davenport conceded that claim in his brief. The trial court determined that Davenport's fraud claims involved future promises and therefore did not constitute fraud as a matter of law. Finally, the trial court granted summary disposition on Davenport's joint venture and partnership claims because Davenport did not identify a business transaction or enterprise that the parties operated for profit. The trial court noted that running a household does not constitute carrying out a business.

The trial court held a bench trial on damages for Davenport's unjust enrichment claim and awarded Davenport $46,252.50 for his contributions to Hrpka's student loans.

## II. STANDARD OF REVIEW

This Court reviews de novo the trial court's decision on a motion for summary disposition. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 115; 839 NW2d 223 (2013). A party is entitled to summary disposition under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." The trial court must consider all the documentary evidence in the light most favorable to the nonmoving party. MCR 2.116(G)(5). A genuine issue of material fact exists if, when viewing the record in the light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Gorman*, 302 Mich App at 115.

To survive a motion for summary disposition, once the moving party has identified issues in which there are no disputed issues of material fact, the burden is on the nonmoving party. MCR 2.116(G)(4); *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The nonmoving party "must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Quinto*, 451 Mich at 362. If the nonmoving party does not make such a showing, the trial court properly grants summary disposition. *Id*. at 363.

## III. UNJUST ENRICHMENT DAMAGES

Davenport contends that the trial court erred when it limited the amount of unjust enrichment damages to the amount that Davenport directly contributed to Hrpka's education, rather than awarding damages for his contributions to the household. We disagree.

We conclude that Davenport has abandoned this issue. If a party does not address the basis of the trial court's decision, we need not even consider granting relief. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004).

In this case, the trial court granted summary disposition in favor of Davenport on the issue of unjust enrichment, but it determined that the damages were limited to the direct financial contributions Davenport made to Hrpka's student loans because Davenport did not address whether he was entitled to damages for household services in his response to Hrpka's motion for summary disposition. In his brief on appeal, Davenport does not even acknowledge that the trial court determined he abandoned this issue, much less address the basis of the trial court's decision. Therefore, we decline to reach the merits of this issue.

## IV. BREACH OF CONTRACT

Davenport contends that the trial court erred when it granted summary disposition on his breach of contract claim because the Marriage Amendment is unconstitutional and the parties' contract was not void as a matter of public policy. Hrpka argues that even presuming the Marriage Amendment is unconstitutional, the parties' contract is void under common-law contract principles. We agree with Hrpka.

Marriage is not merely a personal relationship, but also a public institution. *Attorney General v Marital Endowment Corp*, 257 Mich 691, 694; 242 NW 297 (1932). "One of the essential elements of a valid contract is that it be for a proper subject matter." *Muflahi v Musaad*, 205 Mich App 352, 353; 522 NW2d 136 (1994). Michigan has "abolished the civil cause of action for breach of contract to marry." *Carnes v Sheldon*, 109 Mich App 204, 211; 311 NW2d 747 (1981); MCL 551.301.

> Where not abolished by statute, a right of action for breach of a promise to marry arises on the failure of one of the parties to perform according to the terms of a contract, and if there has been a failure on the part of the defendant in the performance of the terms of the agreement, and that failure has been treated by the other party as a breach, a cause of action arises. [23 Williston, Contracts (4th ed), § 62:27.]

The agreement to marry must have a valid offer and acceptance, which may be implied from the parties' circumstances or conduct, and the parties' mutual promise to marry is sufficient consideration for the contract. *Id*.

In this case, the only consideration stated in the parties' contract is the parties' intent to get married in the future. The first two paragraphs of the contract are devoted to reciting the history of the parties' relationship and their intent to have a wedding. The contract also contains professions of love and several personal promises designed to bind the parties to the relationship, including their promises to consult with an attorney and come to an agreement about property division. The contract does not provide any specific remedy for its breach.

Given the contractual language, reasonable minds could not differ regarding whether the contract is a contract to marry. We conclude that the contract is invalid because Michigan has abolished actions for breach of contract to marry; therefore, the contract does not have a proper purpose.

## V. INFLICTION OF EMOTIONAL DISTRESS

Davenport contends that the trial court improperly granted summary disposition on his negligent and intentional infliction of emotional distress claims because questions of fact existed regarding whether Hrpka's conduct was extreme and outrageous. We disagree.

The elements of intentional infliction of emotional distress are "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Lucas v Awaad*, 299 Mich App 345, 359; 830 NW2d 141 (2013) (quotation marks and citation omitted). Extreme and outrageous conduct is

conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v Mills*, 212 Mich App 73, 92; 536 NW2d 824 (1995). This does not include "mere insults, indignities, threats, annoyances, petty oppressions, and other trivialities." *Id*.

Davenport claimed that several of Hrpka's actions during the relationship were outrageous and caused him emotional distress, including: Hrpka allowed his friends to treat Davenport as a servant rather than a spouse; Hrpka told his parents that Davenport was his roommate who babysat his dogs; Hrpka allowed his friends to mistreat the parties dogs; Hrpka would not walk the dogs; Hrpka broke up with him but did not take care of him; Hrpka scolded him for spending money; Hrpka slapped Davenport in a store for making a statement about another man's attractiveness; Hrpka would "push [Davenport's] buttons on purpose"; Hrpka led Davenport to believe they would build a home together and then refused to put a deposit on the home order; and Hrpka asked Davenport's roommate to move out. Even assuming that these allegations are true, no reasonable jury could find that these actions are atrocious, intolerable, or beyond the bounds of decency. To the contrary, with the exception of the domestic violence, these are standard interactions that a reasonable person would expect to occur during a deteriorating relationship.[2] While they do not fall to the level of trivialities, Hrpka's actions are at best indignities, annoyances, and petty oppressions.

Because reasonable minds could not differ regarding whether Hrpka's conduct was extreme and outrageous, we conclude that the trial court properly granted summary disposition on Davenport's intentional infliction of emotion distress claim. Further, we note that the trial court properly dismissed Davenport's negligent infliction of emotional distress claim because Davenport conceded in his brief on summary disposition that he did not have facts to support that claim. See *Clohset v No Name Corp*, 302 Mich App 550, 555; 840 NW2d 375 (2013) (holding that a party may not create the error that it seeks to correct on appeal).

## VI. FRAUD

Davenport contends that the trial court improperly granted summary disposition because he asserted a valid fraud claim. We disagree.

Fraud requires a statement regarding a past fact. *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). "Future promises are contractual and do not constitute fraud." *Id*. In this case, Davenport asserted that Hrpka defrauded him by making promises that he did not keep. When asked at his deposition which facts Hrpka misrepresented, Davenport could not state any facts that were false when Hrpka stated them. Rather, Davenport

---

[2] Domestic violence is not a standard interaction one would expect to occur during a deteriorating relationship. However, most of the allegations of domestic violence in the parties' relationship involved Davenport striking Hrpka. Davenport's only allegation of domestic violence was that Hrpka slapped him in a store. While domestic violence is not tolerable in a civilized society, the single instance was not so extreme in degree and outrageous that it provided facts to support an intentional infliction of emotional distress claim.

recited promises that Hrpka made to him. The breaking of promises is not fraud. We conclude that the trial court did not err when it concluded that Davenport's fraud claim sounded in contract law and dismissed the claim.

## VII. JOINT VENTURE/PARTNERSHIP

Davenport contends that the trial court improperly granted summary disposition on his joint venture and partnership claims because the parties merged their finances and acted for the purpose of making a profit. We disagree.

A partnership is an association of two or more persons "to carry on as co-owners of a business for profit." MCL 449.6(1). Parties who associate to carry on a business for profit "will be deemed to have formed a partnership relationship regardless of their subjective intent to form such a legal relationship." *Byker v Mannes*, 465 Mich 637, 646; 641 NW2d 210 (2002). Similar to a partnership, a joint venture requires an intent to engage in a business for profit:

The elements of a joint venture are:

(a) an agreement indicating an intention to undertake a joint venture;

(b) a joint undertaking of

(c) a single project for profit;

(d) a sharing of profits as well as losses;

(e) contribution of skills or property by the parties;

(f) community interest and control over the subject matter of the enterprise. [*Meyers v Robb*, 82 Mich App 549, 557; 267 NW2d 450 (1978), citing *Goodwin v S A Healy Co*, 383 Mich 300, 308-309; 174 NW2d 755 (1970).]

In this case, Davenport did not provide facts to show that a genuine issue of material fact existed on these claims. There was simply no evidence that the parties combined their finances and operated as a single unit to *carry on a business* or *single project* for profit. A personal relationship is not a business or project. We conclude that the trial court properly granted summary disposition on Davenport's joint venture and partnership claims.

We affirm.

/s/ Joel P. Hoekstra
/s/ Peter D. O'Connell
/s/ Christopher M. Murray